AO 106 (Rev. 04/10)  Application for a Search Warrant                                                   USAO# 2012R01085

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

| | FILED_____ LODGED |
|---|---|
| | RECEIVED |

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

See Attachment A - Computers and Electronic
Storage Media

```
                                        )
                                        )
                                        )    MAR 2 5 2015
                                        )
                                        )    CLERK U.S. DISTRICT COURT
                                        )    WESTERN DISTRICT OF WASHINGTON AT TACOMA
                                        )    BY                        DEPUTY
```

Case No.   MJ 15 - 5048

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, attached hereto and incorporated herein by reference.

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, attached hereto and incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 26 U.S.C. § 7206(1) | False Tax Filings |

The application is based on these facts:

See Affidavit of Special Agent Aaron Hopper, attached hereto and incorporated herein by reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Aaron Hopper*
*Applicant's signature*

Aaron Hopper, Special Agent, IRS
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   3/25/15

City and state:  Tacoma, Washington

*J. Richard Creatura*
*Judge's signature*

J. Richard Creatura , U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

STATE OF WASHINGTON )
) ss
COUNTY OF PIERCE )

I, Aaron Hopper, a Special Agent with the Criminal Division of the Internal Revenue Service, being first duly sworn, depose and state as follows:

## I.    INTRODUCTION

1.    I submit this Affidavit in support of a search warrant authorizing the examination of the forensic images made of two computers and other electronic storage media currently in law enforcement possession, and the extraction from those images of electronically stored information described in Attachment B.  This is a second application for a search warrant in this case.  On March 13, 2015, I applied for and received authorization to search the residence of Troy X. Kelley, located at 2521 Fremont Street, Tacoma, Washington, for evidence, fruits, and instrumentalities of the offense of False Tax Filing, in violation of Title 26, United States Code, Section 7206(1) (hereinafter, "March 13th Warrant").  A copy of the Application and Affidavit submitted in support of the March 13th Warrant is attached hereto as Attachment C, and incorporated as if fully set forth herein.  As detailed in the March 13th Warrant Affidavit, I have probable cause to believe that Troy Kelley knowingly subscribed to and submitted false tax returns for tax years 2011 and 2012 on behalf of a wholly owned S corporation, Blackstone International, Inc., in order to reduce tax.

2.    The March 13th Warrant authorized, among other things, the seizure of computers and electronic storage media for which searching agents had probable cause would contain evidence, fruits, and instrumentalities of the offense of False Tax Filing, in violation of Title 26, United States Code, Section 7206(1), as described in the warrant. The March 13th Warrant, however, did not permit a further search of the contents of any seized computers or electronic storage media absent a subsequent warrant.  This Affidavit

SW Affidavit/- 1
USAO: 2012R01085

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  is made pursuant to the protocols set forth in the March 13th Warrant to seek further

2  authorization to examine and search the contents of the seized computers and electronic

3  storage media for evidence, fruits, and instrumentalities of the offense of False Tax

4  Filing, in violation of Title 26, United States Code, Section 7206(1) as further set forth in

5  Attachment B.

## II.      EXPERIENCE OF AGENT

7       3.      I am a Special Agent with the Internal Revenue Service, Criminal

8  Investigation (IRS-CI). Relevant aspects of my background and experience are as set

9  forth in the earlier Affidavit submitted in support of the March 13th Warrant, attached

10  hereto and incorporated herein as Attachment C.

11       4.      Because this Affidavit is submitted for the limited purpose of establishing

12  probable cause in support of the application for a search warrant, it does not set forth

13  each and every fact that I or others have learned during the course of this investigation.  I

14  have set forth only the facts that I believe are necessary to the determination of probable

15  cause to believe that evidence, fruits, and instrumentalities of violations of Title 26,

16  United States Code, Section 7206(1) (False Tax Filing) will be found within the forensic

17  images of computers and electronic storage media lawfully seized from Troy Kelley's

18  residence pursuant to the March 13th Warrant.

## III.    IDENTIFICATION OF DEVICES TO BE EXAMINED

20       5.      The items to be searched are forensic images acquired of certain computers

21  and electronic storage media (hereinafter, collectively, "Images"), which devices are

22  specifically described below and again in Attachment A, attached hereto and incorporated

23  herein.  The Images are currently maintained at the IRS-CIS Lab, located at 915 Second

24  Ave., Room 2301, Seattle Washington, 98174:

25       a.      National Guard Thumb Drive;

26       b.      Kingston Data Traveler 4GB Thumb Drive;

27       c.      Memorex Mini TravelDrive 4GB Thumb Drive;

28       d.      ASUS Eee-PC 1005HAB Notebook w/ product key ending in B63;

SW Affidavit/- 2
USAO: 2012R01085

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| | e. | Apple IMac A 1419 Serial Number: D25KJ08KDNCV; |
| | e. | Optometric Physicians of WA Thumb Drive; |
| | f. | Three unlabeled CDs |
| | g. | Lexar Jumpdrive JDE-128-04-500 Thumb Drive; |
| | h. | LaCie Porsche Design P9223 External Hard Drive; and |
| | i. | PNY 4GB Thumb Drive. |

6.       The applied-for warrant would authorize the forensic examination of the Images for the purpose of identifying electronically stored data particularly described in Attachment B.

## IV.   PROBABLE CAUSE

### A.   Probable Cause to Seize the Images

7.       On March 16, 2015, pursuant to the duly authorized March 13th Warrant, law enforcement executed a search of Troy Kelley's residence located at 2521 Fremont Street, Tacoma, Washington.  Among the items seized were the computers and electronic media listed above.[1]  According to information provided by IRS Special Agent and Computer Investigative Specialist, John Medunic Jr., there was probable cause to seize the computers and electronic storage media because they were found under circumstances that demonstrated that Troy Kelley likely had access to the devices, and, as a result, that the items sought in the March 13th Warrant may be found in them.  Specifically, all electronic evidence items seized were located in what appeared to be a home office area within the residence.  The room contained a desk and shelving, and numerous items found in the desk area indicated that the office belonged to or was used by Troy Kelley.  A business card holder on the shelf above the desk contained business cards of Troy Kelley.  Additionally, the right desk cabinet drawers contained various business cards for Troy Kelley and photo IDs bearing Troy Kelley's picture.

---

[1]   In addition to the items specifically described in "Section III  Identification of Devices to be Examined," agents also removed from the residence one additional unlabeled CD, for a total number of 4 seized unlabeled CDs. However, one of those CDs proved to be blank through physical observation of the CD's backside.  Therefore, only three CDs were ultimately imaged.

SW Affidavit/- 3
USAO: 2012R01085

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

8.     All electronic evidence items noted above were found in a powered off state.  The Apple IMac A1419 All-In-One desktop and the ASUS Eee laptop computer were found on the top of the desk in the home office area.  The harddrive, thumb drives, and CDs were found inside the drawers of the same desk in the home office area.  The electronic evidence items were seized from the warrant location and transported back to the IRS-CIS Lab for imaging.  The items were removed from the site because, in the experience of the IRS Special Agent Medunic, a forensic image of an IMac computer typically takes 8-10 hours to acquire.  Therefore, rather than attempt to image on site, all electronic evidence items were taken to the IRS-CIS lab for imaging.  Imaging of the computers began on March 16, 2015.  Imaging of the remaining electronic storage media began on March 17, 2015.

9.     After imaging the IMac, Special Agent Medunic powered up the computer to verify normal operations and, in accordance with the authority granted by the March 13th Warrant, to preview the computer in an attempt to verify users.  The IMac booted directly to display the desktop screen without displaying first a separate log-on prompt. The desktop showed the names and icons of program files and document files.  Special Agent Medunic did not review any of the files.  Special Agent Medunic then performed a normal shutdown.  The shutdown dropdown menu showed a user name of "Troy Kelley."

10.     After imaging the ASUS Eee-PC Notebook, Special Agent Medunic also powered on the laptop to verify normal operations and, per the March13th Warrant, to preview in an attempt to verify users.  Upon booting, the screen displayed the Windows log-on screen with two user names of "Troy" and "Diane."  No further review of the laptop was conducted and Special Agent Medunic performed normal shutdown procedures.

11.     All other electronic evidence items seized consisted of removable media (external hard drive, thumb drives and CDs).  Forensic images of the media were acquired by Special Agent Medunic without further preview.

SW Affidavit/- 4
USAO: 2012R01085

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1     12.     Upon completion of the imaging of the electronic evidence items, a backup

2   copy of the images was created and segregated from the original images.  All imaging

3   was completed by March 18, 2015.  On March 19, 2015, all seized electronic evidence

4   items were returned to counsel for Troy Kelley.

5   **B.     Probable Cause to Search Content of Seized Images**

6     13.     The Affidavit submitted in support of the original March 13th Warrant set

7   forth probable cause to believe that relevant electronic records are likely to be maintained

8   in computers and electronic media controlled by Kelley.  In addition to those reasons, the

9   physical search of the residence revealed additional facts that provide further support to

10   the probable cause determination that relevant electronic evidence will be found in the

11   Images.

12     14.     As detailed in the March 13th Warrant Affidavit, on or about April 19,

13   2013, Kelley consented to a voluntary interview with IRS-CI Special Agents.  During

14   that interview, Kelley explained, in substance, that he was holding reconveyance fees in

15   an impound account, and that as he or his company did further work on reconveyances,

16   he moved what was earned from the impound account and then reported the income on

17   tax returns.  Kelley further explained that reconveyances typically took about ten years

18   and that the work for which the impounded reconveyance fees had been originally given

19   was not complete.

20     15.     During the search of Kelley's residence, searching agents found and seized

21   hard copies of documents that, on their face, corroborate Kelley's statements to the IRS

22   that Blackstone was continuing to work on reconveyances and was incrementally earning

23   the money that was held in an impound account.  However, a closer examination of these

24   documents raises questions about the reasons for, and the timing of their creation, which

25   may be answered by an examination of the contents of the Images seized from Kelley's

26   home.

27

28

SW Affidavit/- 5
USAO: 2012R01085

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    16.    Among the physical documents seized from Kelley's residence was a

2  document entitled "Blackstone International, Inc." (hereinafter, "Blackstone Document").

3  The document is not addressed to anyone.   The document states in part:

4            It is understood that Blackstone International, Inc. is
5            responsible for the continued tracking of documents that its
             subsidiary, United National, LLC, contracted out to complete.
6            Blackstone will open no new files.  Blackstone will not
7            itemize its costs.  Blackstone will complete the work and
             recognize income from the impound account it has been
8            charged to manage at a rate of 10% per year, until all income
             is recognized and the account balance reaches $0 in ten years.
9            Blackstone will track these documents until releases are
10           recorded and will be solely responsible for incurring costs to
11           release the documents . . . .

12           In the event of litigation or pending litigation against itself or
13           any client, Blackstone will suspend any such payment for
             services to itself.  This will not preclude Blackstone from
14           paying third parties in the course of receiving releases.  At the
15           conclusion of such litigation, payments will resume . . . .
                                                * * * *
16           The revenue recognition schedule above is based on multiple
17           Private Letter Rulings from the IRS to First American
             Corporation and Fidelity National Financial, and Staff
18           Accounting Bulletin No. 101 (Revenue Recognition in
19           Financial Statements). . . . If there is a change of law or
             opinion in this area, Blackstone will follow the guidance of
20           the IRS and SEC to either accelerate or decelerate the
21           recognition of income.

22  The Blackstone Document appears to have been signed and dated by hand in the name of

23  Troy X. Kelley with a date of "7-1-08."

24    17.    Agents also recovered a hardcopy of a document written under the heading

25  "ATS Attorney Trustee Services, Inc." (hereinafter, "ATS Letter").  This document

26  appears not to have been dated, but was addressed "To all clients."   The document stated

27  in part:

28           Effective July 1, 2008, our businesses have undergone a
             reorganization to better serve you.  Our new company is

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Attorney Trustee Services, Inc. (ATS), and we hope we will
earn your document tracking business for files that have not
yet closed escrow. The old company, United National LLC
dba The Post Closing Department (PCD) was closed on June
30, 2008. PCD's parent company, Blackstone International
Inc., will continue to handle all files that were opened by
PCD. . . .

\* \* \* \*

A note on your old files. Blackstone will track those
documents until they are released, including court judgments,
liens and mobile home releases. . . . You will no longer
receive the two email statements from us informing you when
we will deduct the open order set up charge, or the continuing
tracking charges from the impound account that we hold.

There will be no new orders to enter into the system. And the
continuing charges . . . will no longer be itemized in a
spreadsheet. Instead, the account will reset on July 1, 2008,
and ten percent will be deducted each year to cover costs of
closing out the old files over the next ten years. For the older
files, we are still responsible for paying for all costs to record
the release, in cases where you initially collected more than
the minimal open order fee and forwarded that to us.

18.     The contents of the Blackstone Document and the ATS Letter appear to

neatly corroborate Kelley's explanation given in April 2013 to IRS-CI Special Agents

about the reasons behind his yearly draw-down of reconveyance fees he held in what he

termed an impound account. These documents also appear to provide support for how it

was that Blackstone continued to incur business expenses into tax years 2011 and 2012.

The ATS Letter specifically noted that Blackstone was "still responsible for paying for all

costs to record the release . . . ." Moreover, if these documents were indeed created in or

about July 1, 2008, prior to Kelley having been directly implicated in the civil law suits

regarding reconveyance fees, and long prior to any law enforcement contact, they would

tend to show that Kelley had a consistently-applied understanding of the tax treatment of

the reconveyance fees that was not motivated by possible legal and criminal exposure.

SW Affidavit/- 7
USAO: 2012R01085

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

19.     There is reason, however, to question the timing of the creation of both the Blackstone Document and the ATS Letter.  As detailed in the March 13th Warrant Affidavit, on or about August 2, 2010, Kelley was deposed under oath in connection with a lawsuit brought by his former escrow company client, Old Republic Title.  During the deposition, Kelley was questioned about the reasons why in June of 2008 he took millions in accumulated reconveyance processing fees and transferred them to an account opened in the name of a newly formed company.  Kelley testified that the fees taken in 2008 were earned as a result of past "services provided," not, as these newly discovered documents purport, to be placed in an impound account and drawn down for future work. At another point in the deposition, Kelley explained that the fees were placed in an account in the name of a new entity at the "advice of counsel" for "estate planning" reasons.  At no point in the deposition did Kelley explain that, in fact, Post Closing Department's parent company, Blackstone, had taken over responsibility for working the remaining files from Old Republic and others, and would, therefore, continue to perform services and legitimately earn the fees into the future.  Nor did Kelley testify at the deposition that he had informed Old Republic or other clients of such a plan back in 2008.

20.     The Blackstone Document and the ATS Letter appear to be printed copies of documents that originated from a computer.  They also appear to have been prepared by Troy Kelley.  Both documents were found in Kelley's home and at least the Blackstone Document was signed by Kelley.  Therefore, there is probable cause to believe that electronic evidence relating to the dates of creation of these documents and others relevant to this investigation as set forth in Attachment B may be found in the Images.

21.     During the execution of the March 13th Warrant, agents also recovered a hardcopy of a document entitled "Bill of Sale 2012 Toyota Highlander."  The document is dated "2-1-13."  This document purports to record the sale of a vehicle belonging to Blackstone to an unidentified purchaser for $20,000, and is signed by Troy X. Kelley as

SW Affidavit/- 8
USAO: 2012R01085

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  president of Blackstone International, Inc.  The Bill of Sale further included an

2  explanation for the transfer, stating "[b]ecause of a change in the needs of the business

3  that could not be anticipated, this vehicle is being sold."  The Bill of Sale also stated that

4  the payment for the vehicle must be made by "October 15, 2013."  Records from

5  Blackstone's Columbia Bank Account *8470 did not indicate a payment to Blackstone in

6  an exact amount of $20,000 during 2013.  However, the bank records do show a deposit

7  to Blackstone of a check written on Kelley's personal Bank of America Account *8143

8  on October 8, 2013, for the amount of $30,000.

9        22.  The March 13th Affidavit noted that the nature and amounts of business

10  expense deductions declared for Blackstone changed in the tax return filed after Kelley's

11  contact with the IRS-CI in April of 2013.  For example, Blackstone's Form 1120S for the

12  tax year 2013, while it reported the same $245,000 of gross profits as it did in 2011 and

13  2012, no longer reported depreciation for any vehicle.  Instead, Blackstone reported a sale

14  of a vehicle on February 1, 2013.  Depreciation for a business vehicle or vehicles had

15  been a substantial portion of the business expense deductions reported in Blackstone's

16  prior tax years.

17        23.  The Bill of Sale recovered from Kelley's residence appears to support the

18  information found on Blackstone's Form 1120S for tax year 2013, and further supports

19  the conclusion that the vehicle was disposed of prior to any contact with law

20  enforcement, and, hence, was not motivated by concerns of criminal exposure.  On the

21  other hand, the Bill of Sale appears self-serving in content and timing.  It is unclear how,

22  as of February 1, 2013, Blackstone encountered a "change in the needs of the business

23  that could not be anticipated" requiring the complete disposition of its business vehicle,

24  but still earned exactly the same $245,000 in gross profits as it did in the prior two years

25  when Kelley claimed 100% business use of two and then one vehicle.

26        24.  This Bill of Sale for the Toyota Highlander, like the Blackstone Document

27  and the ATS Letter discussed above, appears to have been generated on a computer.  The

28  Bill of Sale appears also to have been created by Troy Kelley.  It was found in his

SW Affidavit/- 9
USAO: 2012R01085

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    residence and his signature appears on the document.  Therefore, there is probable cause
2    to believe that relevant electronic evidence relating to the date of creation of this
3    document and others relevant to this investigation may be found in the Images.
4           25.    During the execution of the March 13th Warrant, agents also recovered
5    approximately 204 pages of what appeared to be spreadsheets collectively containing
6    thousands of lines of information.  The individual pages are grouped together into 5
7    separate bundles, each of which was secured with clip-binders.  The spreadsheets are
8    organized vertically into several columns, but nowhere do they show any column
9    headings that would expressly indicate what the information in each column means.
10   However, upon examination, I was able to conclude that on most lines, one column
11   appears to indicate the name of a Washington State county, another column appears to
12   indicate a deed of trust recording number, another column appears to include the name of
13   a lender, and then the final  column sometimes is filled in with what appears to be a deed
14   of reconveyance recording number.  On some lines, however, the deed of reconveyance
15   cell is left blank.
16          26.    I took a small sample of some of the numbers from the spreadsheets that
17   appeared to be deed of trust recording numbers and referenced that number on the county
18   recording office's website for the county indicated in the spreadsheet.  With most
19   samples, the deed of trust recording number matched an existing deed of trust in that
20   county and, where there was an associated deed of reconveyance recording number, the
21   county information also matched the spreadsheet's deed of reconveyance number.  Many
22   deed of reconveyance recording number begins with the year in which the deed is
23   recorded.  The reconveyance recording numbers that are shown on the recovered
24   spreadsheets primarily span recording dates from 2004 through 2007, years in which
25   Kelley operated Post Closing Department.
26          27.    On their face, these spreadsheets give the appearance that Kelley and his
27   company may indeed be continuing to service old files from his former clients in order to
28   support the yearly draw-downs of reconveyance fees he had originally taken in 2008.  On

SW Affidavit/- 10
USAO: 2012R01085

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   the front page of one of the bundles of spreadsheets is found a hand written notation

2   "2013," and in some of the lines of the spreadsheets where there is a deed of trust number

3   but not a reconveyance number, a handwritten notation "c" appears. The "c" may be an

4   indication that some sort of work was done to track and "complete" that reconveyance.

5      28. There is reason again, however, to question the rationale for and the timing

6   of the creation of these spreadsheets. As detailed in the March 13th Warrant Affidavit,

7   on or about May 14, 2008, putative class action lawsuits were filed on behalf of escrow

8   customers against two of Kelley's escrow company clients, Fidelity and Old Republic,

9   alleging that the companies collected excessive and duplicative reconveyance fees. In

10  about September 2008, counsel for the lead plaintiff served Kelley with a subpoena *duces*

11  *tecum* seeking, among other things "[a]ny and all statements, journals, account analyses,

12  or other related documents referring or relating to the following from January 1, 2003 to

13  the present: reconveyance processing, reconveyance tracking . . . ."

14     29. Kelley, however, produced very little material in response to the subpoenas,

15  and did not himself produced spreadsheets containing individual reconveyance tracking

16  information like the ones recovered from Kelley's residence. Instead, he and his counsel

17  maintained throughout the class action litigation, and in the subsequent direct litigation,

18  that the majority of Kelley's business records were burned in a fire that occurred in June

19  2008 in an Everett office building in which Kelley had stored his records. On October

20  31, 2008, then civil counsel for Kelley, Alan Hughes, wrote a letter to plaintiff's counsel

21  explaining the lack of records:

22   > Mr. Kelley was ready to attend the deposition set for today,
23   > and to bring with him all documents responsive to the
     > subpoena *duces tecum* that were not destroyed in the June 26,
24   > 2008 fire. That fire destroyed the Stewart Title Building in
     > Everett where Mr. Kelley ran the business relevant to this
25   > litigation. My understanding is that the **only surviving**
26   > **records are tax returns**, which Mr. Kelley had at his home
     > office.
27

28  (Emphasis added).

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

30.     On August 2, 2010, Kelley was deposed in connection with the direct suit brought by Old Republic.  During the deposition, Kelley testified that his business maintained detailed spreadsheets, or "master logs," that contained information about individual reconveyances his company was tracking and an accounting of fees earned. When Kelley was questioned about the whereabouts of such spreadsheets, Kelley explained that he no longer had any copies of those spreadsheets.

> Q     Do you have those master logs or other documents you
>         just referred to?
>
> A     I do not.
>
> Q     These all destroyed in the fire?
>
> A     Correct.

31.     Kelley also affirmed during the deposition the contents of the October 31, 2008 letter written by attorney Hughes on his behalf regarding the prior destruction of most of Kelley's business records:

> Q: [Referring to the October 31, 2008 Hughes letter] it then
> says "My understanding is that the only surviving records are
> tax returns, which Mr. Kelley had at his home office."  Is that
> a true statement?
>
> A:  I believe the statement is true, though, subsequently, I was
> able to find one or two other items, like business cards and a
> few other things.

32.     The existence of thousands of lines of detailed individual deeds of trust recording numbers and corresponding reconveyance recording data is inconsistent with Kelley's prior statements under oath that his business records, with the exception of tax returns, business cards, and "few other things," had been destroyed in a fire.  Without any underlying records of what his clients had previously asked him to track, it is mysterious

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   how Kelley was able to recreate the thousands of lines of information shown on the

2   spreadsheets recovered from his residence.

3       33.    In addition, other than these spreadsheets, agents did not recover in

4   hardcopy form other indications that Kelley was actively engaged in the business of

5   tracking reconveyances in 2011 and 2012.  For example, agents did not recover any

6   copies of correspondence between Kelley and various escrow companies about the work

7   he was conducting or have completed, nor did they recover any copies of correspondence

8   or records of contact with trustees or lenders following up on reconveyances that had yet

9   to be recorded.

10       34.    Because the spreadsheets recovered from Kelley's residence appear to be

11   computer generated, there is probable cause to believe that relevant electronic data

12   regarding the manner and dates of creation of the document may be found on the Images.

13       35.    Finally, among the items seized from Kelley's residence were hardcopies of

14   what appeared to be detailed accounting ledgers that itemized by year and categories

15   purported Blackstone business expenses that, on the whole, appeared to match business

16   categories of business expenses that were declared for tax years 2010, 2011 and 2012 on

17   Blackstone's Forms 1120S.  Upon review, however, some of the itemized expenses

18   appear not to be related to the operation of a reconveyance tracking business, and,

19   instead, appear to be personal expenses or expenses related to Kelley's campaign.  For

20   example, in the recovered ledger for the time period covering 1/1/2012 – 12/31/2012,

21   Kelley included as part of Blackstone's business expenses certain payments he made to

22   an individual identified as "Miller."  The total amount of payments equaled

23   approximately $1394, and the expenses were categorized as "Business Supplies."  A

24   review of records for Blackstone's Columbia Bank account *8470 showed that in 2012,

25   five checks were written out of the account made payable to Matt Miller.  The total

26   amount of payments made to Matt Miller from the Blackstone Columbia Bank account

27   *8470 equaled the amount listed in the recovered Blackstone ledger for the year 2012.

28

SW Affidavit/- 13
USAO: 2012R01085

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

36.     On or about March 5, 2015, FBI Special Agent Michael Brown interviewed Matthew Miller.  Miller is the former campaign manager for Kelley during Kelley's campaign for Auditor.  Miller is currently employed by the Washington State Auditor's Office as the Deputy Director of External Affairs.  During the interview, Miller was asked about the payments he received from the Blackstone Columbia bank account *8470, and shown physical copies of the checks written to Miller.  The majority of these checks were dated prior to election day, which fell on November 6, 2012.  The last check was dated on the day of the election, November 6, 2012.

37.     Miller did not recall specifically what those checks were for.  However, Miller stated that he never worked for Blackstone and was simply Kelley's campaign manager.  Miller believed the checks could be reimbursements for making copies during the campaign.  Miller also believed it was possible that Kelley wrote him a check to help Miller out after the campaign was over, or for helping Kelley clean his office.

38.     The recovery of hardcopies of Blackstone's accounting ledgers further support the likelihood that the computers and electronic media seized from Kelley's home will contain full electronic versions of accounting records relevant to this investigation.

## V.     PROTOCOL FOR SEARCH OF COMPUTER WITH FILTER TEAM

39.     I am aware that Kelley is currently represented by counsel in connection with this criminal investigation.  As a result, there may be attorney-client privileged material among the electronic records sought by this application for a warrant.  In order to prevent inadvertent exposure to such material by those involved in this investigation, the search of the Images will be wholly conducted by IRS Special Agents from the Criminal Division who, after the search and seizure, will have no further role in the investigation of this matter, other than to establish chain of custody and, if needed, to provide information and/or testimony regarding the conduct of this search and seizure. The search and seizure team will be advised as to the identities of all relevant counsel and

SW Affidavit/- 14
USAO: 2012R01085

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   will be instructed to segregate suspected attorney-client privilege materials and   not

2   communicate to members of the investigative team the contents of such suspected

3   privileged material, and seize only material authorized by this warrant.

## VI.   ELECTRONIC STORAGE AND FORENSIC ANALYSIS

### A.   Scope of Examination

40.     Based on my consultation with those who have specialized knowledge of computers and other electronic devices, I understand that computers and electronic storage media, like those imaged in connection with the March 13th Warrant, can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device used to access the Internet.  This information can sometimes be recovered with forensic tools.

41.     There is probable cause to believe that things that were once stored on such devices may still be stored there, for at least the following reasons:

a.     Based on information provided to me by those who have specialized knowledge of computers and other electronic devices, I understand that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

SW Affidavit/- 15
USAO: 2012R01085

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1         c.      Wholly apart from user-generated files, computer storage media-in

2 particular, computers' internal hard drives-contain electronic evidence of how a computer

3 has been used, what it has been used for, and who has used it. To give a few examples,

4 this forensic evidence can take the form of operating system configurations, artifacts

5 from operating system or application operation, file system data structures, and virtual

6 memory "swap" or paging files. Computer users typically do not erase or delete this

7 evidence, because special software is typically required for that task. However, it is

8 technically possible to delete this information.

9         d.      Similarly, files that have been viewed via the Internet are sometimes

10 automatically downloaded into a temporary Internet directory or "cache."

11     42.   *Forensic evidence.* As further described in Attachment B, this application

12 seeks permission to locate not only electronically stored information that might serve as

13 direct evidence of the crimes described on the warrant, but also forensic evidence that

14 establishes how the devices seized and imaged were used, the purpose of their use, who

15 used them, and when. There is probable cause to believe that this forensic electronic

16 evidence might be on the Images because:

17         a.      Data on the storage medium can provide evidence of a file that was

18 once on the storage medium but has since been deleted or edited, or of a deleted portion

19 of a file (such as a paragraph that has been deleted from a word processing file). Virtual

20 memory paging systems can leave traces of information on the storage medium that show

21 what tasks and processes were recently active. Web browsers, e-mail programs, and chat

22 programs store configuration information on the storage medium that can reveal

23 information such as online nicknames and passwords. Operating systems can record

24 additional information, such as the attachment of peripherals, the attachment of USB

25 flash storage devices or other external storage media, and the times the computer was in

26 use. Computer file systems can record information about the dates files were created and

27 the sequence in which they were created.

28

SW Affidavit/- 16
USAO: 2012R01085

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1              b.     Forensic evidence on a device can also indicate who has used or

2 controlled the device.  This "user attribution" evidence is analogous to the search for

3 "indicia of occupancy" while executing a search warrant at a residence.

4              c.     A person with appropriate familiarity with how an electronic device

5 works may, after examining this forensic evidence in its proper context, be able to draw

6 conclusions about how electronic devices were used, the purpose of their use, who used

7 them, and when.

8              d.     The process of identifying the exact electronically stored

9 information on a storage medium that is necessary to draw an accurate conclusion is a

10 dynamic process.  Electronic evidence is not always data that can be merely reviewed by

11 a review team and passed along to investigators.  Whether data stored on a computer is

12 evidence may depend on other information stored on the computer and the application of

13 knowledge about how a computer behaves.  Therefore, contextual information necessary

14 to understand other evidence also falls within the scope of the warrant.

15              e.     Further, in finding evidence of how a device was used, the purpose

16 of its use, who used it, and when, sometimes it is necessary to establish that a particular

17 thing is not present on a storage medium.

18      43.    *Manner of execution*.  Because this warrant seeks only permission to

19 examine a device already in law enforcement's possession, the execution of this warrant

20 does not involve the physical intrusion onto a premises.  Consequently, I submit there is

21 reasonable cause for the Court to authorize execution of the warrant at any time in the

22 day or night.

23 **B.**     **Search Technique**

24      44.    Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal

25 Rules of Criminal Procedure, law enforcement personnel will execute the search of the

26 Images pursuant to this warrant as follows:  Searching the Images for the items described

27 in Attachment B may require a range of data analysis techniques.  In some cases, it is

28 possible for agents and analysts to conduct carefully targeted searches that can locate

1  evidence without requiring a time-consuming manual search through unrelated materials

2  that may be commingled with criminal evidence.  In other cases, however, such

3  techniques may not yield the evidence described in the warrant, and law enforcement

4  may need to conduct more extensive searches to locate evidence that falls within the

5  scope of the warrant.  The search techniques that will be used will be only those

6  methodologies, techniques and protocols as may reasonably be expected to find, identify,

7  segregate and/or duplicate the items authorized to be seized pursuant to Attachment B to

8  this affidavit.

9  **VII.  REQUEST FOR NONDISCLOSURE AND SEALING.**

10       45.      It has been a long standing, historical principle that search warrants are

11  generally applied for and accorded secrecy pre-indictment.   As explained by the Ninth

12  Circuit in *Times Mirror Co. v. United States*, 873 F.2d 1210, 1213-14 (9th Cir. 1989):

13            We know of no historical tradition of public access to warrant
          proceedings.  Indeed, our review of the history of the warrant
14        process in this country indicates that the issuance of search
          warrants has traditionally been carried out in secret.
15        Normally a search warrant is issued after an *ex parte*
          application by the government and an in camera consideration
16        by a judge or magistrate. *McDonnell Douglas Corp.*, 855 F.2d
17        at 573. The practice of secrecy in warrant proceedings was
          recognized by the Supreme Court in *Franks v. Delaware*, 438
18        U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1977), where the
19        Court considered whether a defendant has a constitutional
          right to make a post-indictment challenge to the truthfulness
20        of an affidavit submitted in support of a warrant. In deciding
21        that the defendant should have that right, the Court noted that
          it is impossible for the defendant to challenge the contents of
22        the affidavits before the warrant is executed because the
23        "proceeding is necessarily *ex parte*, since the subject of the
          search cannot be tipped off to the application for a warrant
24        lest he destroy or remove evidence." *Id.* at 169, 98 S.Ct. at
25        2683 . . . . In sum, we find no historical tradition of open
          search warrant proceedings and materials.
26
27
28       46.      Consistent with the law of this Circuit and Supreme Court precedent, it is

respectfully requested that this Court issue an order sealing, until further order of the

SW Affidavit/- 18
USAO: 2012R01085

1   Court, all papers submitted in support of this application, including the application and

2   search warrants. I believe that sealing these documents is necessary because the items

3   and information to be seized are relevant to an ongoing investigation. Premature

4   disclosure of the contents of this affidavit and related documents may have a significant

5   and negative impact on the continuing investigation and may severely jeopardize its

6   effectiveness in the following ways:

7        47.     As set forth above, and in the March 13th Affidavit, this investigation

8   involves allegations that Troy X. Kelley knowingly declared false and fraudulent

9   business expenses in Blackstone tax returns for tax years 2011 and 2012 in order to

10  ultimately reduce his own tax. While Kelley has been and is represented by counsel in

11  this matter, the details of this particular aspect of the investigation is not believed to be

12  known to Kelley. Among the items seized from Kelley's residence were detailed

13  accounting ledgers covering the relevant tax years that detailed some of the specific

14  expenses for Blackstone, including what appeared to be only the last names of a number

15  of individuals who received payments from Blackstone, or were beneficiaries or guests

16  where Kelley paid for meals. In order for these expenses to be legitimate, they must be

17  necessary and ordinary to the conduct of Blackstone's business, which Kelley has

18  declared in the 2011 and 2012 tax returns as consisting of "document tracking."

19  However, law enforcement cannot definitively conclude on the face of the ledgers

20  themselves whether or not these listed expenses were for legitimate business purposes.

21  This warrant seeks, among other things, electronic records of these detailed ledgers which

22  may assist law enforcement identify, more specifically, these individuals listed in the

23  hardcopy versions of the ledgers. However, even if we find the electronic records in the

24  Images, ultimately, law enforcement must locate and interview these third party

25  witnesses to be able to conclude whether the expenditures Kelley included under their

26  names were indeed in connection with any document tracking business conducted by

27  Blackstone.

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

48.     The government has grave concerns that if this warrant and supporting papers were currently disclosed to the public and Kelley prior to law enforcement completing its investigation, our ability to obtain evidence from these and other third party witnesses will be severely compromised. This is true even though law enforcement has already obtained the images of the computers and electronic storage media and there is little danger that the nature of the electronic evidence itself will be impacted by public disclosure. That is because this is not an investigation that will simply turn on the nature of what is found on the Images. What is found on the Images will likely lead to the identification of additional witnesses from whom law enforcement will need to gather further evidence. Disclosure to Kelley and others of this warrant and supporting material may give Kelley and others an opportunity to obstruct or interfere in our investigation. The concern is heightened by the fact that among the current charges considered by the government against Kelley is perjury and obstruction of justice stemming from Kelley's conduct during his litigation with Old Republic Title. For example, as detailed above, Kelley testified under oath that his business records had been destroyed in a fire that occurred in 2008. Yet agents recovered from his residence hundreds of pages of spreadsheets that appear to contain some of the very records sought during that litigation. For these reasons, I respectfully request sealing of the warrant and supporting papers for a time deemed appropriate by this Court.

//

//

//

//

//

//

//

//

SW Affidavit/- 20
USAO: 2012R01085

## VIII.  CONCLUSION

49.    For the reasons set forth above, there is probable cause to believe that evidence, fruits and/or instrumentalities of False Tax Filing, in violation of Title 26, United States Code, Section 7206(1), are located in the Images of computers and electronic storage media seized pursuant to the March 13th Warrant, as more fully described in Attachment A to this Affidavit.  I therefore request that the court issue a warrant authorizing a search of the Images for the items more fully described in Attachment B hereto, incorporated herein by reference, and the seizure of any such items found therein.

AARON HOPPER, Affiant
Special Agent,
Internal Revenue Service

SUBSCRIBED and SWORN to before me this ___25th___ day of March, 2015.

J. RICHARD CREATURA
United States Magistrate Judge

SW Affidavit/- 21
USAO: 2012R01085